Sidney H. Asch, J.
The disintegration of feudalism corroded the shackles which chained the serf to the manor, freeing him to bargain for land space. Today, the emergence of public and quasi-public housing must compel a reconsideration of traditional principles of landlord and tenant.
Two nonpayment summary proceedings are brought by Lafayette Morrison Housing Project against two named tenants. The tenants live at the project, which is a middle income, limited-profit housing development, consisting of 900 apartments. Lafayette Morrison Housing Incorporated is a company organized and existing under the Limited-Profit Housing Companies Law of the State of New York. (Private Housing Finance Law, art. II.) Commonly, it is known as a Mitchell-Lama Project.
The disputes involved in this proceeding concern the amount of rent which these tenants are required to pay under their leases. By an order issued by the Commissioner of Housing and Community Renewal on November 10,1966, it was provided that the rent for each of the project apartments was to be increased by an amount of $3.60 per room, in two stages: first $1.80 a month, effective December 1, 1966; and an additional $1.80 a month, effective December 1, 1967.
The order of the Rent Commission reads as follows: ‘ ‘ Pursuant to the provisions of Article 2 of the Private Housing Law, I, (Commissioner of Housing and Community Renewal) do hereby authorize the applicants herein, Lafayette Morrison Housing Corp., to increase the average monthly rental per room at Lafayette Apartments to $32.01, on December 1st, 1966, and to $33.81, on December 1st, 1967.”
Each of the tenants involved in these proceedings rented his apartment after December 1,1966, the effective date of the first increase, but before December 1, 1967, the second effective date. At the time that the tenants in question signed their lease, the first increase of $1.80, effective December 1, 1966, was already reflected in the monthly rent. The tenants do not quarrel with this rent increment. It is the second $1.80, effective December 1, 1967, that is being challenged by the tenants.
They argue that since the order of November 10,1966, authorizing the increases, was in existence at the time that they signed their leases, their rents became fixed at the amounts set out in their respective leases, fixed for the duration of their respective leaseholds, except for such subsequent increases as might be authorized by later orders of the Commissioner of Housing and Community Renewal. The tenants also urge, with some persuasive force, that the increases of December 1,1966 and December 1, 1967, were actually vested by the order of November 10, *581 1966, before they had become tenants, that since the leases did not specifically refer to these increases, such increases were reflected in the rent which was set forth in the lease, or waived.
It is undisputed that the increase order of November 10,1966, was properly and legally obtained under section 31 of the Private Housing Finance Law. It came about after lengthy public hearings held on several different days. Both the landlord and a number of tenants,- represented by the Lafayette Residents Association, appeared and made their views known. The order of the Commissioner was affirmed by the Supreme Court, and the Lafayette Residents Association served notice of appeal from this decision. Finally, on October 13, 1967, the association of the tenants through their attorney discontinued and withdrew the appeal.
The tenants occupy apartments in the project under a lease which provides, in part, as follows:
‘1 the Tenant agrees to pay in equal monthly installments in advance on the first day of each month during said term, plus any and all surcharges made in accordance with the Tenant’s family income, pursuant to the Limited-Profit Housing Companies Law and the Rules and Regulations of the Commissioner of Housing and Community Renewal of the State of New York, plus any and all rent increases granted by order of the Commissioner of Housing and Community Renewal pursuant to said Law, all of which the Tenant agrees to pay as additional rent, all payable at the office of the Housing Company or such other place as the Housing Company may designate, without any offset or deduction whatsoever, except that the Tenant shall pay the first monthly installment on the execution hereof (unless this Lease be a renewal).
“ It is understood and agreed that if the rent for the demised premises is increased by reason of an order of the Commissioner of Housing and Community Renewal made pursuant to the Limited-Profit Housing Companies Law of the State of New York, for which increase the Tenant immediately becomes liable as outlined above, then, in that event, and only in that event, the Tenant herein shall have the option to cancel this Lease and vacate the demised premises within 60 days after notice of the above-referred-to rent increase has been given to the Tenant, provided that the tenant gives at least 30 days notice by registered mail to the Housing 'Company of his intention to exercise the option contained herein.” (Italics ours.)
“ sixteenth. This agreement is subject to the powers, rights, and privileges, and the restrictions and limitations thereon, of the Housing Company as a Limited-Profit Housing Company *582 under the supervision and control of the Commissioner of Housing and Community Renewal pursuant to the Limited-Profit Housing Companies Law; and to the rights and powers of said Commissioner under said Law or any amendment thereto, by all of which both parties hereto agree to be governed, and to all of which both parties hereto assent. ’ ’
The landlord in this proceeding is a very special creature of the statute, and is required to comply very strictly with the regulations prescribed, in fixing what amount of rent is to be paid, which tenants are permitted to occupy premises, and in determining most of the other conditions of the tenancy.
All the rules and regulations applicable to rent determination and collection in this instance are collated in the Official Compilation of Codes, Rules and Regulations of the State of New York (9 NYCRR Part 1700, particularly Subparts 1727-3 and 1727-4) which relate to leasing rent determination and collections. The further section 1727-4.2, rent schedules, have particular application to the case at bar and these require that rents or carrying charges be determined by reference to rent schedules approved by the Commissioner. The rents which the housing company did charge were those on rent schedules on file.
These regulations cover virtually all the terms of the lease. They specify the form of the lease and how executed; the duration; the manner in which rents are to be determined; the manner in which rents are to be specified in the lease; the manner of rent collections; the permissible allowances. Virtually, every act of the housing company as to rent is prescribed without discretion by the housing company. An analogy is a utility company charging rates pursuant to filed rates or a railroad, airline or carrier pursuant to filed and approved rates.
Thus, the landlord, which was a creature of the statute, and the tenants when the lease was signed, both were subject to the statute and rules and regulations as prescribed by the statute and rules and regulations as prescribed by the 'Commissioner, including the rents in accordance with schedules approved by the Commissioner. Apparently, there never has been a single instance in this entire housing complex when rent was ever charged to a tenant other than pursuant to the rent schedule on file with the Housing Commissioner. The tenants were aware of, and had with them in court, a copy of the schedule of rents for all the tenants, not simply the apartments in question. The tenants do not dispute that they read this lease or that they were unfamiliar with the lease provisions.
Rent charges in this project are not discretionary. Rents are not “ ceiling rents ” as in the case of controlled apartments *583 where a landlord may collect less than he is allowed to charge. ‘1 Bents are * * * determined "by reference to rent schedules approved by the commissioner.” In controlled buildings, a landlord may not charge in excess of maximum rent. Under the governing rent regulations for Mitchell-Lama Housing, however, the rent in the lease must actually be the same as the rent in the schedule approved by the commission.
In the United States, the main thrust of public law has been on regulation rather than on problems, commonly considered as being within the province of the private sector. In Europe, the law has reached out to meet this expanding concern of the State, but in this country, the managerial aspect of administrative law has been rudimentary, scattered in a desultory manner through governmental rulings, court decisions and law review articles. (Cf. Gellhorn and Byse, Administrative Law, Cases and Comments [1963].)
The common law of contract served an emerging capitalism by encouraging economic initiative; by recognizing the philosophy of “ free will ”, an equality of parties, as well as the right of parties to “ bargain at arm’s length and by furnishing the legal instrument which made it possible for both individuals and wares to be both moved and redistributed. Sir Henry Maine expressed this function of contract, succinctly, when he described the social evolution of the Western man as being from “ status to contract.” But the right to enter into a contract has never been beyond the sphere of the interest of the State. This freedom, even in Adam Smith’s day, has never been completely unfettered. As Bousseau recognized in his theory of the social contract, the individual living in society relinquishes certain of his liberties, including absolute freedom to contract, in return for the benefits of living in an organized society. (Cf. Paton, Textbook of Jurisprudence, § 80; M. Cohen, Law and the Social Order, pp. 69-111; Pound, Introduction to the Philosophy of Law, ch. VI.)
In the impersonal world of today, arm’s length bargaining is even more restricted. Most contracts, in part, at least, leave little room for individual negotiation. Certain conditions are imposed by law as a matter of public policy or by government fiat. Other terms are imposed on nonparticipants to negotiation, as a result of collective bargaining. There is widespread use of “ standard ” clauses and contracts of “ adhesion ”. And the provisions of many contracts are dictated by the growing pressure of the industrial-scientific-military complex. (See, e.g. Fuller, Basic Contract Law [1947]; Kessler and Sharp, Cases *584 and Materials on 'Contract [1943]; and Symposium, 43 Col. L. Rev. 565 [1943].)
Just recently, the Appellate Division, Second Department, recognized the special quality of the relationship between a public housing authority and its tenants. It acknowledged that a “ housing authority is not an ordinary landlord, nor its lessees ordinary tenants.” ■(Matter of Vinson v. Greenburgh Housing Auth., 29 A D 2d 338, 340.)
“ Several considerations combine to justify the difference in treatment between governmental agencies and private individuals. Realistically, it must be acknowledged that the housing project prescribes the terms of the lease and that the tenant does not negotiate with the authority in the normal sense (see Reich, The New Property, 72 Yale L. J. 733, 749-752; Friedman, Public Housing and the Poor; An Overview, 54 Cal. L. Rev. 642,660; Note, Grovernment Housing Assistance to the Poor, 76 Yale L. J. 508, 512).” The same rationale applies equally to the quasi-public housing project involved in this proceeding. (Cf. Symposium on Housing, Law and Contemporary Problems, Spring and Summer [1968].)
The two named tenants in this proceeding did not ‘ ‘ bargain at arm’s length ” with the Lafayette-Morrison Project in an eighteenth or nineteenth century sense. The terms were to a large extent fixed in advance, the actual discretion limited mainly to whether the tenants wishing to enjoy the benefits of this residential project, were willing to assume the obligations which were preordained by State law and regulations, without reference to any negotiations.
What the tenants herein sought was to gain for themselves the same status as every other tenant in this quasi-public project. They could get no more, they could get no less than the rent terms which fixed rent schedules imposed on every tenant.
Did the tenants and the landlord acquire a fixed property right in the rent term as of November 10, 1966, when the order of the commission was issued? Did the amount of rental become fixed as of the date when the leases were signed? Did the rent term remain fluid until December 1, 1967, the effective date of the second increase? It is possible to argue that the tenants acquired a “ property right ” in the rent term protected from State encroachment by the Fourteenth Amendment of the United States Constitution. A beguiling analogy in this situation is that drawn between a vested and contingent interest in the law of future interests. But to engage in such linguistic acrobatics is to perch precariously on the technical distinctions between a remainder absolutely vested, or vested subject to open up, or *585 vested subject to divestment, and to substitute substance for the form. The answer should not turn on the number of angels who can dance on the head of a pin, but rather on the nature of the relationship between the parties.
The tenants herein were not entitled to receive greater benefits than those enjoyed by all the other project tenants. Since the landlord is entitled to a certain return from its investment, if the respondents pay less rent than the others, these latter tenants would be bearing the burden of any lower rentals enjoyed by a few. The lease, by its terms, permits a tenant who is not willing to absorb a rent increase to renounce his tenancy. It seems clear that the respondents essentially were bargaining to achieve a status in the project by their lease, rather than fix the terms of their tenancy on an individual basis.
As villein and lord were emancipated from their relationship which immobilized them to each other and to the land, new legal rights and obligations emerged. The drives of the rootless free men created, first, a copyhold tenure, and then the common-law landlord and tenant relationship. Today, the social and economic pressures for residential land space and the pressing expectations of masses of people must result in a changing law that can meet these new needs.
For the foregoing reasons, the petitions herein are granted.